***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Gregory, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and the subject matter of this claim.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The parties were subject to the Workers' Compensation Act at the time of the injury and an employer-employee relationship existed between them. Cambridge is the administrator for this claim on behalf of the North Carolina Insurance Guaranty Association, the successor in interest to Legion Insurance.
4. Plaintiff sustained an injury on January 6, 2000, and defendants have accepted this claim pursuant to the Form 60 filed with the Industrial Commission.
5. Plaintiff's average weekly wage was $470.90, yielding a compensation rate of $313.94.
6. Plaintiff remains employed by Halifax Community College.
7. Medical records regarding plaintiff's treatment were received into evidence by the Deputy Commissioner as Stipulated Exhibit #1.
8. The following were received into evidence by the Deputy Commissioner as Stipulated Exhibit #2: (1) a letter with an attached invoice of September 16, 2002, to Executive Secretary Weaver; (2) a letter of January 6, 2003, from the Center for Orthotic and Prosthetic Care; and, (3) an Order of the Commission entered by Deputy Commissioner Stephenson dated September 20, 2002.
9. Plaintiff's Motion filed with the Commission on September 11, 2002, was received into evidence by the Deputy Commissioner as Stipulated Exhibit #3.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 50 years old and was working for defendant-employer. At that time, he had worked for defendant-employer as a maintenance technician for approximately six and a half years. Plaintiff's job duties included delivering mail, replacing light bulbs, climbing ladders, and performing work in the shop and yard on vehicles and lawn mowers. Plaintiff was observed to be wearing both orthotic work boots and orthotic tennis shoes at the hearing before the Deputy Commissioner.
2. Plaintiff sustained an admittedly compensable injury to his right foot during the course of his employment with defendant-employer as a maintenance technician on January 6, 2000, when he fell from a ladder and hit his right foot on landscape timber and cement, sustaining a fracture to the heel of his right foot.
3. Plaintiff was initially seen at Halifax Regional Medical Center where he was diagnosed with a comminuted fracture of the calcaneus, or heel bone. Thereafter, plaintiff came under the care of Dr. Marsigili, who performed surgery to repair plaintiff's right foot fracture on January 13, 2000. Following surgery, plaintiff developed an infection, or osteomyelitis, and underwent debridement of the right foot on July 22, 2000. Thereafter, plaintiff continued to have intermittent drainage and pain; however, as of January 22, 2001, Dr. Marsigili found that plaintiff had reached maximum medical improvement, sustaining a 15% permanent partial impairment of the right lower extremity, or a 21% permanent partial impairment of the foot, or a 6% permanent partial impairment of the whole person. However, based upon the greater weight of the medical evidence of record, plaintiff was not yet at maximum medical improvement and required additional medical treatment to effect a cure or provide relief.
4. On December 1, 2000, plaintiff was seen for evaluation by Dr. Levin, who is Board Certified in Orthopaedic Surgery and in Plastic Surgery and who specialized in post-traumatic deformity. Dr. Levin examined plaintiff and found possible osteomyelitis of his calcaneus. Consequently, Dr. Levin referred plaintiff for an MRI, which revealed inflammatory tissue surrounding the comminuted fracture of the calcaneus. Dr. Levin recommended a saucerization to remove the sequestrum, or dead bone, involved in the infection. Thereafter, plaintiff underwent sequestration and debridement of the right heel on February 27, 2001, which was performed by Dr. Levin. Following the surgery, plaintiff's condition improved. On April 20, 2001, plaintiff had no evidence of calcaneal osteomyelitis or infection. However, plaintiff had a limited range of motion due to the fracture and the fixation performed by Dr. Marsigili. Plaintiff was eventually released to return to work in May 2001 upon receipt of his orthotic work boots.
5. Beginning June 22, 2001, plaintiff was able to perform the majority of his work duties, with the exception of ladder climbing, while wearing orthotic work boots that covered and protected plaintiff's injured heel and ankle.
6. Dr. Levin felt plaintiff had reached maximum medical improvement and assigned plaintiff a 10% rating to his foot based on the AMA Guideline, due to plaintiff's loss of motion and flexion.
7. Plaintiff experienced a reoccurrence of the drainage in his right heel and was seen by Dr. Levin on November 16, 2001. Following examination, plaintiff was scheduled for a right calcaneus sequestrectomy, which was performed on January 29, 2002. Thereafter, plaintiff was last seen by Dr. Levin on February 8, 2002, at which time there was no reoccurrence of plaintiff's infection. Dr. Levin did not change plaintiff's impairment rating because it was based on plaintiff's limited range of motion and flexion and heel cord collapse as well as his shortened motor tendon unit related to the collapse of the posterior height of plaintiff's calcaneus, which was not effected by the sequestrectomy. In fact, there has been no surgery to further repair the fracture to plaintiff's foot since the surgery performed by Dr. Marsigili on January 13, 2000. Plaintiff's subsequent surgeries were for debridement of the right heel related to osteomyelitis. After the January 29, 2002, surgery, plaintiff again returned to work for defendant-employer wearing his orthotic work boots, which continued to permit him to perform all of his duties except for climbing ladders.
8. Plaintiff was seen for a second opinion evaluation by Dr. Bloem, an orthopaedist who is not board certified, but did obtain a certification in rating disabilities. Dr. Bloem examined plaintiff on only one occasion, June 11, 2002, and assigned plaintiff a 54% permanent partial impairment rating. Dr. Bloem used the AMA guidelines to assess plaintiff's permanent partial impairment, but did not use the method that considers plaintiff's limited range of motion. Instead, Dr. Bloem assessed plaintiff's rating using the diagnosis related method or DRE system, which is not used by the Industrial Commission Rating Guide. Dr. Bloem felt that the Commission Guidelines and AMA guidelines based on range of motion were insufficient to rate plaintiff. Dr. Bloem strongly considered that plaintiff's condition included ongoing osteomyelitis, but he indicated that there was not a specific portion of the rating for the diagnosis of osteomyelitis. Dr. Bloem primarily focused on plaintiff's x-ray performed at Duke University Medical Center on June 22, 2001, and the angle contained therein. Regarding his assignment of a 54% rating, Dr. Bloem indicated that the angle was less than 90 degrees, and that any amount below 90 degrees would result in a 54% rating.
9. Plaintiff continued to work for defendant-employer wearing his orthotic work boots. During the first week of August 2002, plaintiff noticed a hole in the right boot. By letter dated August 6, 2002, through his counsel, plaintiff requested approval for a new pair of boots. On August 30, 2002, defendants gave approval for the new pair of boots. However, by letter dated September 6, 2002, plaintiff's counsel notified defense counsel that plaintiff had received a telephone call from Duke University Medical Center on September 5, 2002, concerning continued difficulties regarding approval for plaintiff's new work boots. Consequently, plaintiff filed a motion with the Commission on September 9, 2002, requesting an order for defendants to provide medical treatment. However, plaintiff's motion was denied as defendants responded that approval had been given. Regardless of the fact that approval was given by defendants in late August 2002 and prior to plaintiff's motion, plaintiff did not in fact receive his new boots until October 2002.
10. During September 2002, plaintiff became concerned about his safety at work due to the damaged right boot. Plaintiff's job required him to engage in activities such as delivering mail, changing light bulbs, and riding a lawnmower, as well as doing work in the shop where he fixed machinery and vehicles. Plaintiff was concerned about re-injuring or bumping his exposed ankle and heel on any equipment or in the shop.
11. Plaintiff's orthotic work boots extend beyond his ankle and provide additional necessary protection and support for plaintiff's heel and ankle, which were exposed and visibly swollen while wearing the orthotic tennis shoes at the hearing before the Deputy Commissioner. The orthotic tennis shoes do not provide the same amount of support or coverage of plaintiff's injured heel and ankle. Specifically, the orthotic tennis shoes expose at least a half inch or more of his injured and swollen heel and ankle. Plaintiff was consequently concerned about working while wearing the tennis shoes instead of the boots. Regardless of the fact that plaintiff visited defendant-employer's premises while wearing the tennis shoes, his fear and concern about working without the orthotic work boots is reasonable and accepted as credible.
12. Due to plaintiff's concerns, he contacted Dr. Levin's office and was provided a note excusing him from work as of September 26, 2002, until the orthotic work boots were available after plaintiff's final fitting. Dr. Levin did not examine plaintiff prior to providing the out-of-work note.
13. Plaintiff left Dr. Levin's September 26, 2002, out-of-work note on the desk of Ralph Reynolds, defendant — employer's business manager, because plaintiff's supervisor, Mr. Haskins, was on vacation. Plaintiff thereafter spoke to Mr. Haskins and Mr. Reynolds, neither of whom offered plaintiff light-duty employment. Thereafter, plaintiff received his new orthotic work boots. Consequently, by letter dated October 22, 2002, plaintiff was cleared to return to work by Dr. Levin on October 23, 2002, and did in fact return to work at his regular employment wearing the new boots. Furthermore, Dr. Levin specifically indicated that plaintiff was to work in his orthotic boots. While Dr. Levin was not aware of plaintiff's orthotic tennis shoes and therefore could not specifically comment on whether plaintiff could work wearing them, he was concerned about plaintiff's feelings about working without the orthotic boots.
14. Considering the evidence of record, including Dr. Levin's records and testimony as well as plaintiff's testimony, the Full Commission finds that the greater weight of the evidence demonstrates that plaintiff was incapable of earning the same or greater wages from September 26, 2002, until October 23, 2002.
15. Given that Dr. Levin assigned a 10% permanent partial disability rating to plaintiff's right foot, and Dr. Bloem assigned a 54% permanent partial disability rating to the same foot, the Full Commission, in its discretion and drawing upon aspects from the bases of both qualified experts, finds that plaintiff sustained a 32% permanent partial disability to his right foot.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff is entitled to temporary total disability compensation benefits at a rate of $313.94 per week from September 26, 2002 to October 23, 2002. N.C. Gen. Stat. § 97-29.
2. As a result of the January 6, 2000, accident, plaintiff sustained a 32% permanent partial disability to his right foot, which entitles him to compensation at the rate of $313.94 per week for 46.08 weeks. N.C. Gen. Stat. § 97-31(14).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the undersigned enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability benefits at a rate of $313.94 per week from September 26, 2002 to October 23, 2002. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay plaintiff permanent partial disability benefits for his 32% rating to his foot at the rate of $313.94 per week for 46.08 weeks. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
3. An attorney's fee in the amount of 25% of the compensation awarded herein is hereby approved for plaintiff's counsel, such fee shall be deducted from the aforesaid awards and paid directly to plaintiff's counsel.
4. Defendants shall pay interest at 8% per year from January 17, 2003 until paid, with respect to award paragraphs 1 and 2.
5. Defendants shall pay the costs including expert witness fees, if not already paid.
This 15th day of March 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER